[Cite as *State ex rel. Bowman v. Indus. Comm.*, 2020-Ohio-5343.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Cami R. Bowman, | : | |
| Relator, | : | |
| v. | : | No. 19AP-109 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

D E C I S I O N

Rendered on November 19, 2020

**On brief:** *Charles Zamora Co. L.P.A.,* and *Charles Zamora,* for relator*.*

**On brief:** *Dave Yost,* Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

**On brief:** *Perez & Morris, L.L.C., Juan Jose Perez, Richard A. Hernandez,* and *Julian Heinrich,* for respondent Wexner Medical Center at The Ohio State University.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

LUPER SCHUSTER, J.

{¶ 1} Relator, Cami R. Bowman, initiated this original action requesting this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order awarding her a 45 percent loss of vision of her left eye and a 0 percent increase above a previously awarded 67 percent loss of vision for her right eye, and ordering the commission to find that she is entitled to a 70 percent bilateral loss of vision award.

{¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the appended decision, including findings of fact and conclusions of law. The magistrate determined that Bowman demonstrated the commission abused its discretion in denying her requested award, and that this court should issue a writ of mandamus ordering the commission to find that Bowman met her burden of proving that she has a 70 percent bilateral loss of vision and to accordingly grant the requested award.

{¶ 3} The commission has filed objections to the magistrate's decision. Respondent, Wexner Medical Center at The Ohio State University ("OSU"), has joined in those objections. The commission and OSU ("respondents") first contend the magistrate improperly reweighed the evidence to determine that Bowman is entitled to a 70 percent bilateral loss of vision award. Relatedly, respondents argue the magistrate improperly substituted her evaluation of the evidence for that of the commission. And lastly, respondents argue the magistrate ignored the statutory requirements for a loss of vision award. Generally, respondents' objections center on whether the magistrate erred in finding the commission abused its discretion in denying Bowman's request for a 70 percent bilateral loss of vision award. For the following reasons, we find these objections lack merit.

{¶ 4} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, the relator must show a clear legal right to the relief sought, the commission has a clear legal duty to provide such relief, and there is no plain and adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). However, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Thus, at issue here is whether some evidence in the record supported the commission's denial of Bowman's requested award for loss of vision. We concur with the magistrate's conclusion that the commission's denial was not supported by some evidence.

{¶ 5}   R.C. 4123.57(B) authorizes compensation for the loss of a claimant's vision. "For the loss of the sight of an eye," a claimant is entitled to receive 125 weeks of compensation.  "For the permanent partial loss of sight of an eye," a claimant is entitled to "the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury."  R.C. 4123.57(B).  In no case, however, "shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision."  R.C. 4123.57(B).  " 'Loss of uncorrected vision' means the percentage of vision actually lost as a result of the injury or occupational disease."  R.C. 4123.57(B).  Under this standard, "correction enhances vision but does not eliminate the vision loss."  *State ex rel. La-Z-Boy Furniture Galleries v. Thomas*, 126 Ohio St.3d 134, 2010-Ohio-3215, ¶ 16.  Thus, "loss of vision is determined by the measurement of uncorrected vision following the injury, but prior to any corrective surgery such as a lens implant or cornea transplant."  *State ex rel. Baker v. Coast to Coast Manpower, L.L.C.*, v. *Indus. Comm.*, 129 Ohio St.3d 138, 2011-Ohio-2721, ¶ 20 (plurality), citing *La-Z-Boy Furniture Galleries* at ¶ 16; *State ex rel. GE Corp. v. Indus. Comm.*, 103 Ohio St.3d 420, 2004-Ohio-5585, ¶ 16.  Further, "[b]ecause the commission lacks medical expertise, claims involving medical determinations may be established only by submitting appropriate medical evidence."  *State ex rel. Beyer v. Autoneum N. Am. v. Indus. Comm.*, 157 Ohio St.3d 316, 2019-Ohio-3714, ¶ 12.  Consequently, a claimant's degree of visual impairment "must be evaluated by a physician and addressed in the medical evidence submitted to the commission."  *Id.* at ¶ 13.  Conversely, the commission cannot independently apply standard medical guidelines to determine a claimant's percentage of partial vision impairment.  *Id.* at ¶ 14-17.

{¶ 6}   Therefore, in view of Bowman's request for an award of 70 percent bilateral loss of vision under R.C. 4123.57(B), she had the burden of demonstrating, with medical evidence, that her industrial injury caused that degree of visual impairment.  The commission denied the request based on its finding that Bowman did not meet her burden. In particular, the commission found that Marshall Wareham, M.D., in his May 18, 2018 report and September 17, 2018 addendum report, concluded that Bowman suffered a 65 percent loss of vision in her right eye and 45 percent loss of vision in her left eye.  But, as the magistrate determined, the commission's reliance on only a certain limited aspect of

Dr. Wareham's reports misconstrued this physician's opinion as to the extent of Bowman's vision impairment.

{¶ 7} In a December 18, 2016 report, Wesley J. Harnish, M.D., opined that the American Medical Association Guides to the Evaluation of Permanent Impairment (5th Ed.2001) ("AMA Guides") does not provide an appropriate means to determine the extent of Bowman's vision impairment. He further opined that Bowman has lost 70 percent of her vision in both eyes based on her substantial loss of functional vision. In Dr. Wareham's May 18, 2018 report, he agreed with Dr. Harnish's assessment regarding the inappropriateness of strictly following the AMA Guides in this circumstance and his conclusion that Bowman has a 70 percent bilateral loss of vision. In reviewing Bowman's award request, the commission faulted Drs. Harnish and Wareham for not strictly adhering to the AMA Guides, and it referred the matter back to the Administrator of the Bureau of Workers Compensation to have Dr. Wareham opine as to Bowman's loss of vision using the standard guidelines without reservation. In Dr. Wareham's amended report, and as directed by the commission, he limited his analysis to impairment percentages derived from strict application of the AMA Guides. He did not, however, negate his previously provided full analysis of Bowman's degree of impairment, which considered Bowman's vision loss inadequately addressed by the AMA Guides. In denying Bowman's award request, the commission accepted the portion of Dr. Wareham's report and addendum complying with its directive but excluded the remainder. The magistrate reasoned that this constituted an abuse of discretion because the commission did not acknowledge the medical experts' consensus that strict application of the AMA Guides "does not * * * do justice to her actual impairment." (App'x. at ¶ 45.)

{¶ 8} Respondents challenge the magistrate's statement that measurement of Bowman's visual impairment using the AMA Guides does not "do justice" to her actual impairment. Respondents assert that the "do justice" language reflects the magistrate's improper weighing of the equities to determine what, in her view, is fair. They contend the magistrate substituted her factfinding judgment for that of the commission. We disagree. Respondents correctly assert that Dr. Wareham's report and addendum indicate that strictly applying the AMA Guides would result in a finding that Bowman has a 65 percent vision loss in her right eye and 45 percent vision loss in her left eye. But, as the magistrate

noted, Drs. Harnish and Wareham agreed that the degree of Bowman's impairment could not be adequately assessed using the AMA Guides. Thus, the magistrate's reference to doing "justice" was not an improper attempt to apply her own subjective view of fairness. It was an acknowledgment of the physicians' view that limiting an analysis of Bowman's visual impairment to the percentages reflected in the AMA Guides was not sufficiently accurate in defining her impairment. In view of that qualification based on the unique circumstances found in this case, we agree with the magistrate that those percentages could not be relied upon by the commission. Therefore, we reject respondents' argument that the magistrate improperly reweighed the evidence or improperly substituted her view of the evidence for that of the commission.

{¶ 9} Respondents also argue the magistrate erroneously viewed the comparison between pre-injury and post-injury measurements as not the operative measure of impairment for the purpose of R.C. 4123.57(B). We disagree. In her decision, the magistrate noted that, even if Bowman's Snellen fractions were 20/20 before and after the injury, the medical evidence demonstrates that the myriad conditions negatively affecting her ability to see not reflected in those measurements are significant. Contrary to respondents' suggestion, the magistrate did not dismiss the comparison between pre-injury and post-injury measurements. Instead, she emphasized the import of the experts' opinions that the degree of Bowman's impairment cannot be adequately quantified using Snellen fraction measurements and percentage reductions set forth in the AMA Guides. Further, the magistrate correctly noted all the pertinent medical evidence demonstrated Bowman's actual bilateral visual impairment is at least 70 percent. Therefore, we reject respondents' contention that the magistrate ignored the statutory requirements for a loss of vision award.

{¶ 10} For these reasons, we find respondents' objections to be without merit.

{¶ 11} Following our independent review of the record pursuant to Civ.R. 53, we find the magistrate correctly determined that Bowman is entitled to the requested writ of mandamus. The magistrate properly determined the salient facts and applied the pertinent law to those facts. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law. Accordingly, we overrule respondents' objections to the magistrate's decision and grant Bowman's request for a writ of mandamus. The

commission is hereby ordered to vacate its order denying Bowman's 70 percent bilateral loss of vision award request, and to enter an order granting that request.

*Objections overruled;*
*writ of mandamus granted.*

SADLER, P.J., and BROWN, J., concur.

———————————

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Cami R. Bowman, | : | |
| Relator, | : | |
| v. | : | No. 19AP-109 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on June 30, 2020

*Charles Zamora Co. L.P.A.,* and *Charles Zamora,* for relator.

*Dave Yost,* Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

*Perez & Morris, L.L.C., Juan Jose Perez, Richard A. Hernandez,* and *Julian Heinrich,* for respondent Wexner Medical Center at The Ohio State University.

IN MANDAMUS

{¶ 12} Relator, Cami R. Bowman, has filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which awarded her a 45 percent loss of vision of her left eye and a 0 percent increase above a previously awarded 67 percent loss of vision for her right eye, and ordering the commission to find that she is entitled to a 70 percent bilateral loss of vision.

Findings of Fact:

{¶ 13} 1.  On December 30, 2005, relator was working as a nurse for respondent-employer, Wexner Medical Center at The Ohio State University ("OSU"). She was attending a work holiday party and ate some lunch meat provided at the event.  Later that same day, relator became ill.  It was later determined that she contracted a shiga toxin strain of escherichia ("E. Coli").

{¶ 14} 2.  No one could have anticipated the unprecedented degree of injury that would follow her exposure to this particular strain of E. Coli.

{¶ 15} 3.  Ultimately, relator's workers' compensation claim would be allowed for the following conditions:

> E Coli/shiga toxin colitis; right blepharospasm; movement disorder right eye; aggravation cataract right eye; right anisometropia; left anisometropia; diplopia; dark adapted electroretinography (ERG) changes; 67 percent loss of uncorrected vision in right eye; nyctalopia bilateral eyes; cataract left eye.

{¶ 16} **Blepharospasm** is defined in *Taber's Cyclopedic Medical Dictionary* 280 (23d Ed.2017) as "A twitching or spasmodic contraction of the orbicularis oculi muscle due to tics, eye strain, or nervous irritability."  In other words, involuntary closure or twitching of the eye.  **Nyctalopia** is defined at page 1668 as "inability to see well in faint light or at night."  **Anisometropia** is defined as the "condition in which the two eyes have unequal refractive power.  One eye may be myopic (nearsighted) and the other hyperoptic (farsighted) or one eye may be markedly stronger than the other." *See* http://www.medicinenet.com/script/main/art.asp?articlekey=20150.  **Diplopia** is commonly known as double vision.

{¶ 17} 4. On April 16, 2012, relator filed a motion to have a scheduled loss of bilateral vision greater than 25 percent pursuant to R.C. 4123.57(B) based on reports from Thomas Mauger, M.D, and Mary Lou McGregor, M.D.  In his January 23, 2012 report, Thomas Mauger, M.D., opined that relator had lost at least 25 percent of her functional capacity based on her visual system.  Specifically, Dr. Mauger stated:

> Cami Bowman sustained an injury to her eyes concurrent with her E. coli/Shigatoxin colitis that resulted in right eye blepharospasm and a movement disorder of the right eye. She

also had a secondary cataract which required removal and resultant anisometropia. She has had ongoing problems using her eyes and now with the increase in computer work do [sic] the installation of an electronic medical record system at Ohio State she is unable to function.

It is difficult to determine an exact percentage of loss, but I feel, due to her motion disorder and blepharospasm, that she has lost at least 25% to her functional capacity based on her visual system.

I would note that she has seen Dr. Mary Lou McGregor for her ocular motility problem and she might be able to be more specific on the grading of this problem. Please contact me if you have any questions regarding her care.

{¶ 18} In her April 4, 2012 report, Dr. McGregor opined that relator had a 50 percent loss of use of functional vision.  Specifically, Dr. McGregor stated:

Following Cami's infection, she developed a cataract in the right eye, which required surgery. Postoperatively, she has had a constant problem with double vision and fusion. Prior to the cataract surgery and immediately after the infection she also developed an involuntary disruption of her normal eye movements. She has blepharospasm and spontaneous involuntary saccades. I believe this abnormal eye movement is the most likely cause of the fusional difficulties and diplopia. She has a small exotropia and right hypertropia, which are objective and not subjective findings, which require prism therapy. Even with the prism in her glasses she cannot maintain fusion all the time, which makes driving much more difficult and limits her to daytime driving. Even if she closes one eye to get rid of the double vision, she still has the abnormal eye movements which continue to cause problems. Therefore, I feel that Cami has 50% loss of the use of her functional vision, because it interferes with driving, use of a computer, which makes it difficult for her in her daily job, reading and other leisure activities.

{¶ 19} 5. The Bureau of Workers' Compensation ("BWC") obtained an independent medical eye examination by Kathleen McGowan, M.D.  In her July 16, 2012 report, Dr. McGowan noted the following during her examination:

Her uncorrected distal visual acuity is 20/100 OD and 20/50 OS. Her uncorrected near visual acuity is Jaeger one (+2) OD

and Jaeger 7 OS. With correction of her refractive error with -2.50+0.50×45 OD, her corrected distance acuity is 20/20 OD. With refractive correction of -0.75+0.75 x 175 OS, her corrected distance acuity is 20/20 OS. With a near add of +2.50 OU her corrected near acuity is Jaeger 1+ OU. Pupil reflexes are normal. Ocular motility is full and normal but there are abnormal ocular movements that consist of intermittent, seemingly involuntary, saccades to the right and right-upward. There are intermittent episodes of seemingly involuntary rapid blinking, and blinking with a fluttering movement and prolonged closure of the lids. At times the right upper lid is slower to descend in the blinking movement than the left upper lid. Slit lamp examination reveals clear cornea OD, and the faintly visible corneal scars from the LASIK surgery OS. The corneal surfaces are dry with decreased pre-corneal tear film. The anterior chambers and iris are normal OU. There is a posterior chamber intraocular lens implant in good position OD. The lens is clear OS. Intraocular pressures are 14 mm Hg OD and 12 mm Hg OS. Dilated fundus examination reveals normal pink optic nerves with 0.2 cup/disc ratio, normal macula, retinal vessels and periphery. Goldmann visual fields were performed with a 111-4 white test and the visual fields are full and normal OU.

{¶ 20} Thereafter, Dr. McGowan provided her opinion as to the percentage of loss of vision per the AMA Guidelines, stating:

According to the AMA Guides to the Evaluation of Permanent Impairment, 4th Edition, the uncorrected acuity in the right eye of 20/100, Jaeger 1, corresponds to a 63% loss of central vision (allowing for pseudophakia) (Table 3, page 212). There is no loss of ocular motility or diplopia, but there are some fleeting incursions of abnormal eye movements, which may be assigned a discretionary value of 10% impairment. There is no loss of visual fields. Combining the loss of central vision (63%) with an additional 10% impairment for the abnormal eye movements, results in a 67% impairment (Combined Values Chart, page 322).

{¶ 21} 6. Relator's motion was heard before a district hearing officer ("DHO") on September 13, 2012. The DHO denied the motion in its entirety, stating:

It is the finding of the Hearing Officer that the Injured Worker is requesting a bilateral loss of use of uncorrected vision. The Hearing Officer finds that the Injured Worker, prior to the date of injury, did wear contacts. The medical records

submitted do not take into account what the Injured Worker's vision was prior to the date of injury. Neither Dr. McGregor nor Dr. Mulder compared the Injured Worker's uncorrected vision now versus her uncorrected vision prior to the date of injury. In addition, Dr. McGowan in a report dated 7/16/2012, states that the Injured Worker does not have bilateral loss of vision. It is therefore the order the Hearing Officer that the Injured Worker's request for a SCHEDULED LOSS OF USE **AWARD FOR BILATERAL LOSS OF VISION is DENIED**.

(Emphasis sic.)

{¶ 22} 7. Relator appealed, and the matter was heard before a staff hearing officer ("SHO") on October 23, 2012. The SHO vacated the prior DHO order and granted claimant a 67 percent loss of vision of uncorrected vision in her right eye based on the medical report of Dr. McGowan. The SHO denied the request for loss of vision of the left eye also based on the report of Dr. McGowan.

{¶ 23} 8. The commission refused OSU's appeal.

{¶ 24} 9. Thereafter, relator developed a cataract in her left eye and nyctalopia, and underwent cataract surgery for the left eye. Essentially, all the problems that relator had previously developed in her right eye, she began developing in her left eye as well.

{¶ 25} 10. On March 21, 2018, relator filed a motion requesting a loss of uncorrected vision bilaterally in the amount of 70 percent. Relator noted that the commission had previously found that she had a 67 percent loss of uncorrected vision in the right eye only, as such, relator was seeking a 3 percent increase in visual loss in her right eye and a 70 percent loss of uncorrected vision in her left eye. Relator relied on the previously filed reports of Drs. McGowan and McGregor.

{¶ 26} Relator also included the December 18, 2016 report of Wesley J. Harnish, M.D., who was asked to utilize the Fifth Edition American Medical Association ("AMA") Guidelines and provide his medical opinion concerning relator's percentage of permanent partial disability. He was also asked to review the May 9, 2016 report of Dr. Jacobson, and provide a detailed explanation regarding if Jacobson applied the Fifth Edition of the AMA Guidelines properly. (Dr. Jacobson had opined that relator had a 0 percent permanent partial impairment due to the fact that her corrected vision was 20/20

in each eye.  He also was unable to test whether or not she had diplopia or night vision problems, and he believed she should restart Botox injections for blepharospasm. However, given the persistent blepharospasm and other problems, he opined that 20 percent impairment was fair.) Dr. Harnish responded:

> The measurement of Snellen visual acuity is inappropriate when trying to evaluate her ability to see. She can only fix on a target for a few microseconds at a time. Despite normal acuity, the ability of the brain to use that data is much impaired. I cannot, should not and will not give an answer to a misleading question. The AMA guidelines are not and never were intended to evaluate this situation. The ability to use visual field data is dependent on the eye being fixed on a target and therefore visual field data is of no use in trying to evaluate her problem. After reviewing Dr. Jacobson's letter, I have concluded that he did not apply the AMA guidelines properly, in particular the AMA guidelines are useful, when central vision or peripheral vision has been damaged. Nevertheless, there are substantial and even devastating damages to vision which may occur which do not register in any significant manner when measuring central or peripheral vision. Ms. Bowman has had loss of the muscular control of the eyes both in terms of the extra ocular muscles and the eye lid muscles which, as I had mentioned in the above description, causes the eyes to move suddenly and unpredictably so that she gets double vision on some occasions, loss of fixation on other occasions (loss of seeing the target), and loss of vision altogether if she has blepharospasm.
>
> All three of these occur at random intervals therefore make it impossible for her to function in a normal way when reading. In particular, either one, two or three of these events are occurring approximately 60% of the time, which is an estimate due to the fact that I cannot measure these exactly. This means that she is only able to acquire information from a target (see it) approximately one third of the time. The brain requires time to comprehend target data after it has fixed on that target. Therefore, the useful time of having the target acquired is probably even less than a third of the time. This means that she can only read a few letters or words at a time and cannot really function to do the job of a nurse adequately or with any reasonable efficiency. The best comparable medical situation to this would be someone that has pieces of central vision damage such as by macular degeneration where they continue to lose their target because it falls into a tiny

scotoma, and although she has no scotoma, she has a functional experience similar to having a scotoma, because she simply cannot keep the object that it is to be viewed on the target of the retina. Therefore, she loses functionality a large part of the time. A layman's comparison would be: Imagine trying to read a book that someone kept jerking away. Now imagine that someone kept putting their hand in front of you every few seconds while the first person was still jerking the book away at odd intervals. Now imagine that in the moments when you could actually see the book you had double vision because your eye muscles would not keep your eyes pointed in the same directions. All of this is assuming that the viewer has normal visual field and acuity. This is much like the situation Ms. Bowman experiences. As a result, I conclude that her loss is substantial. She has a combination of abnormal eye movement disorder, blepharospasm and diplopia which all contribute to diminishing her ability to function visually. Therefore, the use of the standard guidelines to evaluate this disease is worse than misleading. Therefore, we can only give professional estimates as to what kind of deficits these disorders would cause.

Finally, I will comment that my past experience in the field of neuro ophthalmology and there is not a substantial care which can be offered from neuro ophthalmology. I know as much about strabismus as anyone who takes care of adults with strabismus.

Therefore, my final conclusion is that she has substantial loss of functional vision. It is approximately at the level of 70% which is the best estimate that we can get and while it does not refer to the AMA guidelines it is because they are not appropriate for this sort of disease.

{¶ 27} 11. The BWC obtained a report dated May 18, 2018 from Marshall Wareham, M.D., who stated:

I would state there are several issues with this case. In general, I would be in agreement with the report that was prepared by Wesley Harnish, MD, dated 12/18/2016. I think that her difficulties are not adequately assessed by the *AMA Guidelines*, Fifth Edition, so I would agree with his estimate of a 70% loss in both eyes; however, if the *AMA Guidelines*, Fifth Edition, must be followed strictly, then it would be a 65% loss in the right eye and 45% loss in the left eye.

I feel, on several levels, this assessment of her visual loss is inadequate and incorrect. First, it is very unlikely that her uncorrected vision prior to the injury was 20/20 in each eye, but I am told the report must be prepared that way despite the fact that it is very likely untrue.

Second, it makes no sense to compare uncorrected visual acuity when the claimant did wear contact lenses and glasses previously. A much more valid assessment would be based on vision with correction in both situations.

Third, she does have significant motility disturbances and as noted in Dr. Harnish's report, where he summarizes it very well, she has significant difficulty with her vision because of the motility disturbance which was clearly caused by the injury as well as the blepharospasm of her right eye. The combination of these factors, certainly makes her visual disability far greater than is assessed by strictly following the *AMA Guidelines, Fifth Edition.*

In summary, strictly following the *AMA Guidelines,* Fifth Edition, I would assess a 65% vision loss in the right eye, 45% vision loss in the left eye, but I feel this is a very poor assessment of her condition from many aspects.

{¶ 28} 12. The matter was heard before the DHO on August 13, 2018. The DHO referred the matter back to the administrator for corrected and updated medical evidence consistent with the requirements of the order. Specifically, the DHO order provides:

The Motion is fundamentally predicated upon a report by Wesley J. Harnish, M.D., dated 12/18/2016. Dr. Harnish, noting the unique circumstances of this particular case, finds functional loss of vision at 70%, but essentially derives this finding from the admittedly unique circumstances of causation, outcome and symptoms in the claim, does not appear to base his finding upon uncorrected vision provision post-injury as required pursuant to R.C. 4123.57 (B) and otherwise disputes the utility of application of AMA Guidelines to the matter.

In connection with the application, the Administrator commissioned the report of Marshall Wareham, M.D. dated 05/18/2018. Dr. Wareham agrees with Dr. Harnish that the Injured Worker has an estimated 70% loss of use in both eyes, effectively declaims the applicability of the AMA Guidelines

Fifth Edition and undermines his reliance upon post-injury visual acuity in so doing. Ultimately, Dr. Wareham agrees with Dr. Harnish that the best estimate is a loss of 70%, which appears not to be based upon the statutory assessments.

The District Hearing Officer thus orders that the matter be referred back to the Administrator for an addendum by Dr. Wareham expressly opining upon loss of use of uncorrected vision bilaterally based upon uncorrected vision post-injury, absent recitation of conditions negating the viability of the assessment, and taking into account the prior denial of loss of vision left eye exceeding 25 percent.

Once the opinion has been obtained, the District Hearing Officer orders that the matter be referred back to the Industrial Commission for placement upon the district-level docket.

{¶ 29} 13.  In his September 17, 2018 report, Dr. Wareham stated:

Based on the information that I have, we do not know what the claimant's uncorrected vision was prior to her injury. However, I am required to assume that was 20/20 in each eye without correction. Her vision post-injury uncorrected was 20/200 in the right eye and 20/70 in the left eye. According to the *AMA Guides to the Evaluation of Permanent Impairment, Fifth Edition*, Chapter 12, because of her significant motility disturbances, double vision, and blepharospasm, she would have 15 points of visual acuity loss to each eye. This would become 65% loss of vision in the right eye and 45% loss of vision in the left eye.

While I disagree with the prior assumption of less than 25% vision loss based on the information that I have and the assumptions that I am required to make, same has been adjudicated by the Industrial Commission, so any finding 25% or more in the left eye would be moot.

{¶ 30} 14.  The matter was reheard before a DHO on October 22, 2018.  The DHO made the following finding:

It is the order of the District Hearing Officer that the Injured Worker's C-86 Motion, filed 03/21/2018, is granted to the extent of this order.

The District Hearing Officer finds that the Injured Worker is entitled to a 45% schedule loss award under R.C. 4123.57 (B) for scheduled loss of bilateral vision, specifically for the left eye.

This finding is based on the report of Dr. Wareham's [sic], dated 05/18/2018 and the addendum dated 09/17/2018, in which Dr. Wareham opined the Injured Worker has experienced a 65% loss of vision in the right eye and 45% in the left. The District Hearing Officer notes the Injured Worker received a previous award of bilateral loss of use of uncorrected vision in the amount of 67% for the right eye by Staff Hearing Officer order dated 11/01/2012. Therefore, the District Hearing Officer does not find a basis to award an additional amount for the right eye.

The District Hearing Officer orders the scheduled loss of use award paid beginning 05/18/2018 based upon Dr. Wareham's report dated the same.

{¶ 31} 15.  Both relator and OSU filed appeals.

{¶ 32} 16. OSU obtained a medical records review and examination by Dan Brown, M.D.  In his October 25, 2018 report, Dr. Brown noted:

[Relator] says that she can see well with each eye individually, but she has pain and fatigue and uncontrolled eye movement when she attempts to use the eyes together. Covering either eye improves her vision somewhat but results in an intolerable level of dull pain around the right eye, and she cannot cover either eye comfortably for more than a few seconds. Various medications have been used to no avail; she currently takes gabapentin daily but is not sure if it really helps.

{¶ 33} Dr. Brown further noted the following findings on examination:

My exam on this date showed visual acuity uncorrected of 20/200 OD, 20/100 OS at distance. Her near acuity uncorrected was Jaeger 1 in each eye. Her vision in the right eye corrected to 20/30 with her refraction of -2.00-0.50×138, and vision in the left eye corrected to 20/30 with her refraction of -1.50-0.50×63. The external exam shows a mild ptosis on the right with signs of levator aponeurosis dehiscence on that side; there is intermittent spasm of the twitch muscles around both eyes, worse on the right, and a somewhat uneven blink response. Pupils are equal and

reactive. Muscle balance shows full versions and no diplopia; there are random saccades mostly up and to the right, with greater amplitude on the right. There is no true nystagmus. Visual field testing was normal. Slit lamp exam showed evidence of LASIK flap on the left cornea, well centered posterior chamber lens implants, and an open capsule on the right with a clear capsule on the left. There was some reduction of tear meniscus bilaterally but no corneal staining. There was no evidence of intraocular inflammatory changes. Intraocular pressure was 13 OD, 10 OS. Opthalmoscopic exam was unremarkable with C/D ratio of 0.3 OU; the nerves were of normal color and were flat. The maculae, vessels and retinal periphery were all unremarkable.

**{¶ 34}** Thereafter Dr. Brown stated:

I have no objective evidence of nyctalopia for review; if indeed that condition exists, I would estimate an additional 10 to 15% loss in the right eye.

\* \* \*

As above, I cannot ascertain a definitive diagnosis of nyctalopia. With respect to the cataract, her uncorrected vision is now 20/100 in the left eye so there would be a further loss of function; using the AMA guide [Fourth Edition] chart, I believe this increases to 70 to 80%.

**{¶ 35}** 17. The appeals were heard before an SHO on December 26, 2018. The SHO affirmed the prior DHO order, stating:

The Staff Hearing Officer finds Injured Worker is entitled to a 45% scheduled loss award pursuant to R.C. 4123.57 (B) for scheduled loss of bilateral vision, specifically as it relates to her left eye. This decision is based on the report and addendum report from Marshall Wareham, M.D., dated 05/18/2018 and 09/17/2018. Dr. Wareham concluded the Injured Worker suffered a 65% loss of vision in her right eye and 45% in her left eye. The Staff Hearing Officer notes, as the District Hearing Officer did below, the Injured Worker previously received an award for bilateral loss of use of uncorrected vision of 67% for the right eye pursuant to Industrial Commission order, dated 11/01/2012. Accordingly, the Staff Hearing Officer finds insufficient basis to award an additional percentage for the right eye.

The Staff Hearing Officer orders the scheduled loss of use award shall be paid beginning 05/18/2018 based on Dr. Wareham's previously cited report.

{¶ 36} 18. The appeals by both parties were refused by the commission. Thereafter, relator filed this mandamus action in this court.

Conclusions of Law:

{¶ 37} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 38} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 39} R.C. 4123.57 pertains to partial disability compensation and provides, in pertinent part:

Partial disability compensation shall be paid as follows:

* * *

(B) * * * For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of

compensation be made for less than twenty-five percent loss of uncorrected vision. "Loss of uncorrected vision" means the percentage of vision actually lost as a result of the injury or occupational disease.

{¶ 40} In *State ex rel. Chrysler LLC v. Indus. Comm.*, 10th Dist. No. 08AP-1005, 2010-Ohio-85, this court stated at paragraph 54:

This court has repeatedly held that it is within the commission's discretion to fashion a PPD award by choosing a percentage of impairment within the range of percentages contained in the medical reports upon which it has relied. *State ex rel. Core Molding Technologies v. Indus. Comm.*, Franklin App. No. 03AP-443, 2004-Ohio-2639; *State ex rel. Wrenn v. [The] Kroger Co.*, Franklin App. No. 03AP-14, 2003-Ohio-6470. In that situation, there is no requirement that the commission explain why it selected the percentage chosen.

{¶ 41} This particular case is made especially difficult due to the fact that all of the physicians who authored reports for the commission's consideration opined that relator has sustained a significant amount of loss of vision which is not easy to objectively quantify due to her inability to keep her eyes open and maintain focus. Furthermore, all the physicians agree that the use of the AMA Guidelines is an insufficient method whereby to measure relator's actual visual impairment.

{¶ 42} The AMA Guidelines are traditionally used by physicians to provide impairment ratings; however, the commission has never adopted the guidelines as a rule, regulation, or guideline to be used by hearing officers.

{¶ 43} In the present case, when asked to use the guidelines, the medical providers generally agree that relator has sustained a 65 percent loss of vision in her right eye and a 45 percent loss of vision in her left eye. However, when asked what her actual impairment is, without necessarily confining themselves exclusively to the guidelines, all of the medical professionals agree that her loss of vision is at least 70 percent.

{¶ 44} The commission argues that it is permitted to choose a percentage within the range of percentages opined by the medical physicians. While this is a true statement of law, in the present case, the commission chose to accept one portion of Dr. Wareham's report and addendum where he confined his opinion to the AMA Guidelines and excluded

the remainder of his report wherein he stated that use of the guidelines is inadequate, and relator has at least a 70 percent impairment. His opinion that her impairment was actually at least 70 percent bilaterally is consistent with all the medical evidence.

{¶ 45} Workers' compensation statutes must be liberally construed in favor of the injured worker. While generally speaking, it would be acceptable for the commission to select a percentage within the range of percentages stated by the physicians, the magistrate finds that here, where all the physicians agree that relator's actual visual impairment is 70 percent or greater, the commission did abuse its discretion in finding that she had a 65 percent impairment in the right eye and a 45 percent impairment in the left eye. The reality is that, even if this injured worker had 20/20 vision, the additional conditions which affect her (her inability to keep her eyes open, the uncontrollable blinking of her eyes, the uncontrollable side to side movement of her eyes, double vision, the inability of her eyes to focus in concert with each other, and night blindness) significantly impair her ability to see making the fact that this hypothetical injured worker had 20/20 vision inconsequential and irrelevant. To the extent that her loss can actually be measured, that measurement does not, in the opinion of all of the medical experts, do justice to her actual impairment. As such, the magistrate finds the commission did abuse its discretion in this situation.

{¶ 46} Based on the foregoing, it is this magistrate's decision that relator has demonstrated that the commission abused its discretion here, and this court should issue a writ of mandamus ordering the commission to find that relator has met her burden of proving that she has a 70 percent loss of vision bilaterally, and this court should order the commission to make that finding.

/S/ MAGISTRATE
STEPHANIE BISCA

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).