[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Bowman v. Indus. Comm.*, Slip Opinion No. 2022-Ohio-233.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-233

THE STATE EX REL. BOWMAN, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Bowman v. Indus. Comm.*, Slip Opinion No. 2022-Ohio-233.]

*Workers' compensation—Awards under R.C. 4123.57(B) for permanent partial loss of sight—Industrial Commission abused its discretion by basing its award on application of American Medical Association's* Guides to the Evaluation of Permanent Impairment *("AMA guidelines") when only medical evidence on which commission relied stated that AMA guidelines do not adequately assess percentage of total vision employee lost—Court of appeals' judgment granting writ of mandamus ordering commission to grant award affirmed.*

(No. 2021-0007—Submitted October 26, 2021—Decided February 2, 2022.)

APPEAL from the Court of Appeals for Franklin County, No. 19AP-109, 2020-Ohio-5343.

**Per Curiam.**

{¶ 1} Appellee, Cami R. Bowman, asked appellant, the Industrial Commission of Ohio, for an award of compensation under R.C. 4123.57(B) for the permanent partial loss of her sight, based on a 70 percent bilateral loss of vision. The commission issued an order awarding compensation based on only a 45 percent loss of sight in the left eye and maintaining a prior award based on a 67 percent loss of sight in the right eye. The commission's order relied on a physician's report stating that the American Medical Association's *Guides to the Evaluation of Permanent Impairment* ("AMA guidelines") should not be applied to Bowman's unusual injury, because the AMA guidelines do not properly account for the percentage of vision she lost but that if the AMA guidelines had to be applied, her loss of vision under its rubric would be 45 percent in the left eye and 65 percent in the right eye.

{¶ 2} Bowman asked the Tenth District Court of Appeals for a writ ordering the commission to vacate its order and award the requested compensation. The Tenth District granted the writ, concluding that the commission abused its discretion by relying on the part of the report the physician had disclaimed. The commission appealed. We affirm the Tenth District's judgment.

## I.FACTS AND PROCEDURAL HISTORY

{¶ 3} In December 2005, Bowman contracted an E. coli infection from food provided by her employer, the Ohio State University Wexner Medical Center. The infection led to unusual vision problems, including the development of a cataract in her right eye, double vision, and the "involuntary disruption of her normal eye movements."

{¶ 4} Bowman sought an award of workers' compensation benefits under R.C. 4123.57(B), which allows compensation "[f]or the permanent partial loss of sight of an eye * * * based upon the percentage of vision actually lost as a result of

2

the injury or occupational disease." In 2012, the commission granted Bowman an award based on a 67 percent loss of sight in her right eye.

{¶ 5} Her problems worsened, however, coming to include a cataract in her left eye and bilateral night blindness. In 2018, she applied for an R.C. 4123.57(B) award based on a 70 percent bilateral loss of sight. Bowman supported her application primarily with the report of Wesley J. Harnish, M.D., who had conducted an independent medical examination.

{¶ 6} Dr. Harnish wrote that Bowman had "several ophthalmologic deficits which stem from an infection with E. coli and treatment thereafter with anti-nausea drugs approximately ten years ago." He further observed, "It is unclear how much of the deficit comes from the direct toxin of the bacteria versus the reaction to the anti-nausea medications." He went on to describe Bowman's condition:

> Her pupils react normally but she has vastly abnormal eye movement which consists of darting of the eyes in abnormal directions which is uncontrollable. She has blepharospasm[1] and she complains of diplopia.[2] Discussing the situation with her, she also has sensitivity to light which frequently is associated with such neurologic deficits. She also has slow dark adaptation. She has pseudophakia[3] on the right and a minimal cataract on the left. She has been approved for poor dark adaptation which I did not check today and she has patchy visual field loss.

---

1. Blepharospasm is "spasmodic winking from involuntary contraction of the orbicular muscle of the eyelids." *Webster's Third New International Dictionary* 233 (2002).

2. Diplopia is "a disorder of vision in which two images of a single object are seen owing to unequal action of the eye muscles." *Webster's Third New International Dictionary* at 638.

3. Pseudophakia is "[a]n eye in which the natural lens is replaced with an intraocular lens." *Stedman's Medical Dictionary* 1453 (26th Ed.1995).

**{¶ 7}** Dr. Harnish had been asked to respond to two questions: (1) Under the fifth edition of the AMA guidelines, what, if any, percentage of permanent partial disability does Bowman have based solely on the allowed conditions in her claim? and (2) Did Dr. Leonard Jacobson—who opined in 2016 that Bowman had a 20 percent permanent partial impairment—properly apply the AMA guidelines? Dr. Harnish's combined response to both questions, while lengthy, is helpful to understanding this case:

> The measurement of Snellen visual acuity[4] is inappropriate when trying to evaluate her ability to see. She can only fix on a target for a few microseconds at a time. Despite normal acuity, the ability of the brain to use that data is much impaired. I cannot, should not and will not give an answer to a misleading question. The AMA guidelines are not and never were intended to evaluate this situation. The ability to use visual field data is dependent on the eye being fixed on a target and therefore visual field data is of no use in trying to evaluate her problem. After reviewing Dr. Jacobson's letter, I have concluded that he did not apply the AMA guidelines properly, in particular the AMA guidelines are useful, when central vision or peripheral vision has been damaged. Nevertheless, there are substantial and even devastating damages to vision which may occur which do not register in any significant manor [sic] when measuring central or peripheral vision. Ms.

---

4. Visual acuity "describes the ability of the eye to perceive details." American Medical Association, *Guides to the Evaluation of Permanent Impairment* 280 (5th Ed.2001). Visual-acuity values are usually stated in terms of a Snellen fraction, e.g., 20/20 or 20/40. *Id*. at 284; *see also State ex rel. Beyer v. Autoneum N. Am.*, 157 Ohio St.3d 316, 2019-Ohio-3714, 136 N.E.3d 454, ¶ 4.

Bowman has had loss of the muscular control of the eyes both in terms of the extra ocular muscles and the eye lid muscles which, as I had mentioned in the above description, causes the eyes to move suddenly and unpredictably so that she gets double vision on some occasions, loss of fixation on other occasions (loss of seeing the target), and loss of vision all together [sic] if she has blepharospasm.

All three of these occur at random intervals therefore make [sic] it impossible for her to function in a normal way when reading. In particular, either one, two or three of these events are occurring approximately 60% of the time, which is an estimate due to the fact that I cannot measure these exactly. This means that she is only able to acquire information from a target (see it) approximately one third of the time. The brain requires time to comprehend target data after it has fixed on that target. Therefore, the useful time of having the target acquired is probably even less than a third of the time. This means that she can only read a few letters or words at a time and cannot really function to do the job of a nurse adequately or with any reasonable efficiency. * * * A layman's comparison would be: Imagine trying to read a book that someone kept jerking away. Now imagine that someone kept putting their hand in front of you every few seconds while the first person was still jerking the book away at odd intervals. Now imagine that in the moments when you could actually see the book you had double vision because your eye muscles would not keep your eyes pointed in the same directions. All of this is assuming that the viewer has normal visual field and acuity. This is much like the situation Ms. Bowman experiences. As a result, I conclude that her loss is substantial. She has a combination of abnormal eye movement disorder, blepharospasm

and diplopia which all contribute to diminishing her ability to function visually.  Therefore, the use of the standard guidelines to evaluate this disease is worse than misleading.  Therefore, we can only give professional estimates as to what kind of deficits these disorders would cause.

>     * * *

> [M]y final conclusion is that she has substantial loss of functional vision.  It is approximately at the level of 70% which is the best estimate that we can give and while it does not refer to the AMA guidelines it is because they are not appropriate for this sort of disease.

{¶ 8} The Bureau of Workers' Compensation commissioned a report by Marshall Wareham, M.D.  Dr. Wareham agreed with Dr. Harnish's opinion regarding the inapplicability of the AMA guidelines, but he also opined on what Bowman's visual impairment would be under the AMA's rubric, if it were required to be followed:

> In general, I would be in agreement with the report that was prepared by Wesley Harnish, MD, dated 12/18/2016.  I think that [Bowman's] difficulties are not adequately assessed by the *AMA Guidelines*, Fifth Edition, so I would agree with his estimate of a 70% loss in both eyes; however, if the *AMA Guidelines*, Fifth Edition, must be followed strictly, then it would be a 65% loss in the right eye and 45% loss in the left eye.
>
>     I feel, on several levels, this assessment of her visual loss is inadequate and incorrect. * * *
>
>     * * *

> [S]he does have significant motility[5] disturbances and as noted in Dr. Harnish's report, where he summarizes it very well, she has significant difficulty with her vision because of the motility disturbance which was clearly caused by the injury as well as the blepharospasm of her right eye. The combination of these factors, certainly makes her visual disability far greater than is assessed by strictly following the *AMA Guidelines*, Fifth Edition.
>
> In summary, strictly following the *AMA Guidelines*, Fifth Edition, I would assess a 65% vision loss in the right eye, 45% vision loss in the left eye, but I feel this is a very poor assessment of her condition from many aspects.

**{¶ 9}** The district hearing officer ("DHO") observed that Dr. Wareham's report "effectively declaims [sic: disclaims] the applicability of the AMA Guidelines Fifth Edition and undermines his reliance upon post-injury visual acuity in so doing." The DHO asked Dr. Wareham to provide an addendum to his report "expressly opining upon loss of use of uncorrected vision bilaterally based upon uncorrected vision post-injury, absent recitation of conditions negating the viability of the assessment." Dr. Wareham provided the requested addendum, reiterating that under the AMA guidelines, Bowman's loss of vision would be 65 percent in the right eye and 45 percent in the left eye, and he did not retract his previous statement that the AMA guidelines do not provide an accurate assessment of Bowman's vision loss.

**{¶ 10}** Citing Dr. Wareham's opinion and addendum, the DHO issued an order maintaining a previous award based on a 67 percent loss of vision in the right eye and granting a new award based on a 45 percent loss of vision in the left eye.

---

5. Motility is "[t]he power of spontaneous movement." *Stedman's Medical Dictionary* at 1131.

Both Bowman and her employer filed appeals. The staff hearing officer affirmed the DHO's order, in reliance on Dr. Wareham's opinion and addendum. Bowman and her employer again appealed. The commission refused both appeals.

{¶ 11} Bowman brought this mandamus action in the Tenth District, arguing that the commission's reliance on the portion of Dr. Wareham's opinion that the doctor had expressly disclaimed was an abuse of discretion and that the commission's order was therefore not supported by some evidence and was contrary to law. She sought a writ ordering the commission to vacate its prior orders and enter a new order granting her request for compensation or, alternatively, a writ ordering the commission to enter an order based on some evidence. The Tenth District agreed with Bowman and granted a writ ordering the commission to vacate its denial of her request for compensation. 2020-Ohio-5343, ¶ -9. The commission appealed to this court.

## II. ANALYSIS

### A. *Mandamus Standard*

{¶ 12} When reviewing a claim for a writ of mandamus in a workers' compensation case, a court's role is to determine whether the commission abused its discretion. *See State ex rel. Packaging Corp. of Am. v. Indus. Comm.*, 139 Ohio St.3d 591, 2014-Ohio-2871, 13 N.E.3d 1163, ¶ 29. The commission is the exclusive finder of fact and has the sole responsibility to evaluate the weight and credibility of the evidence. *State ex rel. Perez v. Indus. Comm.*, 147 Ohio St.3d 383, 2016-Ohio-5084, 66 N.E.3d 699, ¶ 20.

### B. *Loss of Vision and Medical Evidence*

{¶ 13} R.C. 4123.57(B) provides, "[f]or the permanent partial loss of sight of an eye," an injured worker may receive as disability compensation "the portion of one hundred twenty-five weeks [of the statewide average weekly wage] as the administrator in each case determines, *based upon the percentage of vision actually lost* as a result of the injury or occupational disease." (Emphasis added.)

**{¶ 14}** The statute refers to the percentage of *vision* lost. "Vision" is not necessarily synonymous with "visual acuity." As we recently explained, vision has several components, including visual acuity, visual field, and ocular motility. *State ex rel. Beyer v. Autoneum N. Am.*, 157 Ohio St.3d 316, 2019-Ohio-3714, 136 N.E.3d 454, ¶ 4, citing the AMA guidelines. If the injured worker has conditions affecting aspects of vision other than visual acuity, the "percentage of vision actually lost" must account for those factors. *See id.*

**{¶ 15}** We also explained in *Beyer* that the commission lacks medical expertise and that therefore, "claims involving medical determinations may be established only by submitting appropriate medical evidence." *Id.* at ¶ 12. In claims seeking compensation for the permanent partial loss of vision under R.C. 4123.57(B), the degree of the injured worker's visual impairment, i.e., the percentage of uncorrected vision lost, must be determined by physicians—not the commission. *Id.* at ¶ 12-13, 17.

### C. The Parties' Arguments

#### 1. The Commission

**{¶ 16}** The commission correctly points out that the court of appeals cannot evaluate the weight and credibility of the evidence; that is solely a job for the commission. *See State ex rel. Teece v. Indus. Commission*, 68 Ohio St.2d 165, 169, 429 N.E.2d 433 (1981); *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18, 20, 508 N.E.2d 936 (1987). The commission is also correct that courts typically uphold commission decisions that are supported by "some evidence" in the record. *See State ex rel. Stephenson v. Indus. Comm.*, 31 Ohio St.3d 167, 170, 509 N.E.2d 946 (1987).

**{¶ 17}** The commission argues that the Tenth District violated these rules by improperly reweighing the evidence and substituting its evaluation for that of the commission. More specifically, the commission frames the treatment of Dr. Wareham's report as hinging on an issue of credibility: it argues that the Tenth

District found the portion of Dr. Wareham's report that disclaimed the applicability of the AMA guidelines more credible than the portion that applied them; the commission contends that therefore, the Tenth District granted the writ on an improper basis. The commission asserts that some evidence—the portion of Dr. Wareham's opinion applying the AMA guidelines—supported its decision and that the Tenth District's disturbance of that decision thus was out of bounds.

{¶ 18} The commission further points out that when faced with two different physicians' opinions, each setting forth a different percentage of impairment, the commission has the discretion to choose between the opinions—adopting one and rejecting the other—or to find that the injured worker's percentage of impairment is somewhere between the percentages. *See State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm.*, 97 Ohio St.3d 179, 2002-Ohio-5811, 777 N.E.2d 241, ¶ 9. The commission argues, essentially, that it applied this principle when it selected the portion of Dr. Wareham's report on which to rely.

{¶ 19} Finally, the commission argues that the determination of Bowman's impairment should be based on measurable, quantifiable factors and that it "properly followed its standardized procedures, use of the AMA Guidelines, and requirements of R.C. 4123.57(B) when it rendered its decision. It did not go rogue and disregard the uniformity of the system just to accommodate Bowman's rather unusual combination of conditions."

### 2. *Bowman*

{¶ 20} Bowman correctly points out that no statute or regulation requires the commission to apply the AMA guidelines. She argues that the commission abused its discretion by insisting on the strict application of the AMA guidelines in this case, because those guidelines do not adequately assess her actual loss of vision. More specifically, she argues that the commission abused its discretion by relying on Dr. Wareham's application of the AMA guidelines because Dr.

Wareham stated that the assessment of her visual impairment under those guidelines was "inadequate and incorrect."

### D. Tenth District's Judgment Affirmed

{¶ 21} The AMA guidelines set forth a framework under which the degree of impairment of various body systems may be estimated. American Medical Association, *Guides to the Evaluation of Permanent Impairment* 1 (4th Ed.1993). But even the guidelines themselves acknowledge that they are not necessarily applicable to all medical situations. *Id.* at 3 ("the *Guides* does not and cannot provide answers about every type and degree of impairment"). And as the commission concedes, use of the AMA guidelines is not mandatory. Moreover, as we explained in *Beyer*, it is the physician's job—not the commission's—to determine the percentage of vision lost. 157 Ohio St.3d 316, 2019-Ohio-3714, 136 N.E.3d 454, at ¶ 12-13. We also stated in *Beyer* that "visual impairment may * * * be established by evidence of a physician's opinion regarding the percentage of uncorrected vision that the claimant has lost." *Id.* at ¶ 17. In this case, Dr. Wareham's opinion that Bowman suffers from a 70 percent visual impairment was proper evidence, even though the opinion did not rely on the AMA guidelines.

{¶ 22} Though the commission relied solely on Dr. Wareham's opinion, it chose to ignore his assessment of Bowman's vision loss in favor of a strict application of the AMA guidelines, despite Dr. Wareham's insistence that those guidelines do not adequately assess the percentage of vision Bowman lost. The commission's reliance on Dr. Wareham's grudging application of the AMA guidelines was an abuse of discretion. In effect, the commission stepped into the physician's role by overruling the only doctor's opinion it relied on to choose the metric that would enable an accurate assessment of Bowman's impairment.

{¶ 23} The commission correctly notes that it has the discretion to credit one physician's opinion over another, but that is not what it did in this case. That discretion does not allow the commission to carve up the opinion of a single

physician and base its decision on a portion of the opinion that the physician has expressly disclaimed or repudiated. Indeed, we have long held that repudiated opinions are not proper evidence. *See State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649, 657, 640 N.E.2d 815 (1994) ("equivocal medical opinions are not evidence * * * [and] equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement"). In this case, the commission selected a percentage of impairment that no physician backed—a basic failure to base its decision on medical evidence. *See Beyer* at ¶ 13.

{¶ 24} We find unavailing the commission's argument that it followed its standard procedure by applying the AMA guidelines and that it did not "go rogue" and sacrifice the "uniformity of the system" in order to "accommodate Bowman's rather unusual combination of conditions." Accounting for Bowman's unusual conditions is exactly what R.C. 4123.57(B) required the commission to do: the award must be based on "the percentage of vision actually lost."

{¶ 25} Bowman's allowed conditions resulted in an unusual kind of vision loss, as described in detail by Dr. Harnish, with whom Dr. Wareham agreed. Because the only medical evidence on which the commission relied stated that the AMA guidelines do not adequately assess the percentage of total vision Bowman lost, the commission abused its discretion by basing its award on the application of the AMA guidelines.

{¶ 26} We affirm the Tenth District's judgment granting a writ ordering the commission to vacate its prior orders and to grant Bowman's request for an award under R.C. 4123.57 based on a 70 percent bilateral loss of vision.

### III. CONCLUSION

{¶ 27} In light of the foregoing, we affirm the Tenth District's judgment.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, FISCHER, DEWINE, DONNELLY, STEWART, and BRUNNER, JJ., concur.

———————————

Charles Zamora Co., L.P.A., and Charles Zamora, for appellee.

Dave Yost, Attorney General, and Natalie J. Tackett, Assistant Attorney General, for appellant.

———————————