[Cite as *State ex rel. Tanyhill v. Indus. Comm.*, 2026-Ohio-1823.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Andre C. Tanyhill,               :

    Relator,                                   :

                                             No. 25AP-187

v.                                             :

                                     (REGULAR CALENDAR)

Industrial Commission of Ohio et al.,          :

    Respondents.                               :

D E C I S I O N

Rendered on May 19, 2026

**On brief:** *The Bainbridge Firm, LLC*, and *Jacob B. Brandt*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *David M. Canale*, for respondent, Industrial Commission of Ohio.

**On brief:** *Reidenbach Law Group, LLC, Emily N. Dodd*, and *J. Michael Reidenbach*, for respondent, Central Ohio Behavioral Healthcare.

IN MANDAMUS
ON OBJECTIONS TO MAGISTRATE'S DECISION

BEATTY BLUNT, J.

{¶ 1} Relator, Andre C. Tanyhill, has filed objections to our magistrate's decision, which recommended denial of his petition for a writ of mandamus. Tanyhill seeks a writ to order respondent, the Industrial Commission of Ohio ("ICO"), to vacate the denial of his request for scheduled-loss compensation for partial loss of vision and to issue a new order awarding said compensation.

{¶ 2} On November 13, 2022, Tanyhill was serving as a corrections officer for respondent, Central Ohio Behavioral Healthcare ("COBH"), when he was attacked by a COBH patient, who struck him multiple times in the head and face. It is accordingly

undisputed that Tanyhill sustained injuries in the course and scope of his employment, and the ICO subsequently allowed Tanyhill's claims for left eye conjunctival hemorrhage, concussion without loss of consciousness, head contusion, head laceration, retinal tears (multiple), left eye retinal hole, and substantial aggravation of generalized anxiety disorder.

{¶ 3} On December 5, 2023, Tanyhill sought additional scheduled-loss benefits under R.C. 4123.57 for partial loss of uncorrected vision. On March 11, 2024, the Ohio Bureau of Worker's Compensation ("BWC") found, based on Dr. Maria Armstrong-Murphy's March 6, 2024 physician record review, that Tanyhill had sustained vision loss in his left eye in the amount of 25 percent. BWC accordingly approved Tanyhill's request for scheduled-loss compensation.

{¶ 4} COBH sought review of BWC's decision, and requested a medical examination by Dr. Jennifer A. Mattson, who both reviewed Tanyhill's medical records and examined Tanyhill herself. Dr. Mattson concluded Tanyhill was "nearsighted (myopic)," that he "reported getting his first pair of glasses while he was in his teen years," that his uncorrected vision was "20/100 OD and 20/100 OS, 20/70 OU," which was "consistent with the amount of myopia he has in each eye," and that based on those findings, she "would conclude that there is *no uncorrected vision loss*," and that his "refractive error was not taken into account when visual impairment was determined." (Emphasis added.) (Stipulated Record of Evidence No. 00074, Evaluation Report of Andre Tanyhill by Jennifer A. Mattson, OD at 4.)

> Because Mr. Tanyhill is nearsighted and has worn glasses since he was in his teens, per his history, it cannot be assumed that his pre-injury vision was at 100% uncorrected. The most accurate way to determine any vision loss would be by his his [sic] *best corrected visual acuity*, which in the left eye was 20/40 on 11/14/2022 (one day after injury), 20/20 on 1/7/2023, 20/25 on 05/22/2023, and 20/30 on the day of my examination. This is considered visual acuity in the normal range per the AMA Guides to the Evaluation of Permanent Impairment.

(Emphasis in original.) *Id.* Notwithstanding Dr. Mattson's report, after a hearing on May 9, 2024, an ICO district hearing officer affirmed BWC's order finding that Tanyhill had suffered 25 percent vision loss in his left eye and awarding scheduled-loss compensation.

{¶ 5}   COBH filed an appeal of that award, and following a June 28, 2024 hearing, the ICO's staff hearing officer vacated the district hearing officer's decision, finding that she was "not persuaded that the Injured Worker has met his burden of proving that he sustained a loss of vision in his left eye due to his injury that is the subject of this claim," relying on the opinion of Dr. Mattson "who opines that there is no uncorrected vision loss," and rejecting the opinion of Dr. Armstrong-Murphy:

> [T]he only medical provider who purports to provide a percentage of vision loss, Maria Armstrong-Murphy, M.D., in her 03/06/2024 addendum report, states that the Injured Worker's uncorrected visual acuity is not noted in the chart, the post injury uncorrected visual acuity has not been tested at the ophthalmologist, the Injured Worker states he has had a change in his eyeglasses but this evaluation from the ophthalmologist is not available for her review, the Injured Worker has not had a repeat eye examination and acuity testing, it is recommended that the Injured Worker have a post injury uncorrected visual acuity test, and there has not been repeat visual acuity testing noted in the chart for her review and once it is available she is happy to write an addendum to her review, all of which gives the Hearing Officer the impression that Dr. [Armstrong-]Murphy does not have confidence in her opinion as she does not have sufficient medical evidence to review.

(Stipulated Record No. 00080, Record of Proceedings at 1.)  Tanyhill appealed to the board, but on August 1, 2024, the ICO issued an order refusing the appeal.  (Stipulated Record No. 00083.)  This mandamus action followed.

{¶ 6}   Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate.  After briefing and consideration, the magistrate concluded:

> [I]t is the claimant's burden to affirmatively demonstrate with medical evidence the loss at issue under R.C. 4123.57(B). . . . Where there is no evidence to support the loss at issue, the claimant has not met their burden and the request for scheduled-loss compensation under R.C. 4123.57(B) must be denied. . . . Thus, even if the [ICO] erred in relying on Dr. Mattson's report, the staff hearing officer's conclusion that Tanyhill had not "met his burden of proving that he sustained a loss of vision in his left eye due to his injury that is the subject of this claim" would remain to support denial of an award. . . . As there remained no medical evidence to support

> Tanyhill's request for a scheduled loss-of-sight award following the rejection of Dr. [Armstrong-]Murphy's report, the magistrate cannot find that the [ICO] abused its discretion in denying Tanyhill's request. [As such,] Tanyhill has not demonstrated a clear legal right to the requested relief or that the [ICO] had a clear legal duty to provide such relief.

(Internal citations omitted.)  (Appended Mag.'s Decision at ¶ 58-59.)  Tanyhill has filed objections to the magistrate's decision, which are now ripe for consideration.

{¶ 7}  In his objections, Tanyhill argues that the magistrate erred first by endorsing the ICO's decision to reject the report of Dr. Armstrong-Murphy and, second, by concluding that the report of Dr. Mattson was "some evidence" supporting the ICO's decision to deny scheduled-loss compensation because that report failed to apply the correct standard to determine loss of vision.  In response, the ICO and COBH argue that the ICO acted properly in finding Dr. Armstrong-Murphy's conclusions not credible and refusing to rely on them, that Dr. Mattson's report was "some evidence" supporting the ICO's decision, and that even if Dr. Mattson's report was flawed and unreliable, any error in relying on that report was harmless because Tanyhill had failed to meet his burden to set forth credible evidence of his entitlement to scheduled-loss compensation.

{¶ 8}  A writ of mandamus is an extraordinary remedy that " 'command[s] the performance of an act which the law specifically enjoins as a duty.' " S*tate ex rel. Russell v. Klatt*, 2020-Ohio-875, ¶ 7.  To be entitled to a writ, Tanyhill is required to establish (1) a clear legal right to the requested relief, (2) that the ICO had a clear legal duty to provide such relief, and (3) he lacked an adequate remedy in the ordinary course of the law.  *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).  A writ of mandamus lies only when "there is a legal basis to compel the [ICO] to perform its duties under the law or when the commission has abused its discretion in carrying out its duties."  *State ex rel. Cassens Corp. v. Indus. Comm.*, 2024-Ohio-526, ¶ 10.  Notably, a writ of mandamus "may issue against the Industrial Commission if the commission has incorrectly interpreted Ohio law." *State ex rel. Gassmann v. Indus. Comm.*, 41 Ohio St.2d 64, 65 (1975).  The ICO does not abuse its discretion to determine factual matters if there is some evidence in the record upon which it could have based its determination.  *See State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165, 167 (1981).  *See also State ex rel. Johnson v. Indus. Comm.*, 11 Ohio App.3d 22, 23 (10th Dist. 1983) ("For more than fifty years, the 'some-evidence' rule,

although not always referred to by that name, has been recognized as the rule to be applied in determining whether there has been an abuse of discretion with respect to factual matters."). And in "matters affecting the rights and obligations of the claimant or employer, the [ICO] must specifically state what evidence has been relied upon and briefly explain the reasoning for its decision. *See State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991), at syllabus; *State ex rel. Yellow Freight Sys. v. Indus. Comm.*, 1994-Ohio-173." (Appended Mag.'s Decision at ¶ 46.)

{¶ 9} R.C. 4123.57(B) provides:

> In cases included in the following schedule the compensation payable per week to the employee is the statewide average weekly wage . . . and shall be paid in installments according to the following schedule:
>
> . . .
>
> For the loss of the sight of an eye, one hundred twenty-five weeks.
>
> For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. *"Loss of uncorrected vision" means the percentage of vision actually lost as the result of the injury or occupational disease.*

(Emphasis added.) R.C. 4123.57(B).

{¶ 10} As the magistrate observed, the statute "contains two provisions authorizing scheduled loss-of-vision awards: one for the total 'loss of sight of an eye,' regardless of the percentage of vision lost, and another for the 'permanent partial loss of sight of an eye,' which depends on the percentage of vision lost," and that therefore "[t]he question under R.C. 4123.57(B) is whether a claimant has suffered loss of sight or partial loss of sight." (Further quotation marks deleted and citations omitted.) (Appended Mag.'s Decision at ¶ 47.) "[T]o establish a claim for a scheduled-loss award for partial loss of sight under R.C. 4123.57(B), a claimant is 'required to submit medical evidence showing the degree of [the] visual impairment.' . . . [And in such] claims . . . the degree of the injured worker's visual impairment, i.e., the percentage of uncorrected vision lost, must be determined by

physicians—not the [ICO]." (Internal citations omitted.) (Appended Mag.'s Decision at ¶ 49.)

{¶ 11} Both the ICO and the magistrate have observed defects with Dr. Armstrong-Murphy's report—specifically, that Tanyhill's uncorrected visual acuity was not noted in the report, and also that his post-injury uncorrected visual acuity had not been tested. And Tanyhill has not pointed to anything in the record to cure what appears to be a flaw in his case, in that his evidence does not establish the difference between his pre- and post-injury *uncorrected* visual acuity, as required by the statute. Accordingly, we conclude that the ICO correctly refused to consider Dr. Armstrong-Murphy's opinion as evidence supporting Tanyhill's additional claimed benefit. Moreover, even if we accept Tanyhill's argument that Dr. Mattson's opinion cannot be used to establish that Tanyhill did not suffer any *uncorrected vision loss*, the evidence demonstrates his post-injury *corrected visual acuity* is in the normal range.

{¶ 12} Based on the law and record, we conclude that both of Tanyhill's stated objections lack merit, and they are therefore overruled. The ICO did not err by refusing to rely on Dr. Armstrong-Murphy's report, and there is some evidence in the record supporting its decision. Moreover, even if Dr. Mattson's opinion is excluded in its entirety, Tanyhill has failed to point to any other evidence establishing his entitlement to additional claimed scheduled-loss benefits under R.C. 4123.57 for partial loss of uncorrected vision. The magistrate correctly concluded that Tanyhill has not demonstrated a clear legal right to the requested benefits, and that Tanyhill has not shown that the ICO had a clear legal duty to provide such benefits. And as we have found no error of law or other defect on the face of the magistrate's decision denying Tanyhill's petition for writ of mandamus, we adopt it as our own, including the findings of fact and conclusions of law as they are set forth in the decision, and we deny Tanyhill's request for a writ of mandamus.

*Objections overruled*;
*magistrate's decision adopted*;
*writ of mandamus denied*.

MENTEL and EDELSTEIN, JJ., concur.

——————————

# APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Andre C. Tanyhill, | : | |
| Relator, | : | |
| v. | : | No.  25AP-187 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

## MAGISTRATE'S  DECISION

Rendered on December 19, 2025

*The Bainbridge Firm*, *LLC*, and *Jacob B. Brandt*, for relator.

*Dave Yost*, Attorney General, and *David M. Canale*, for respondent Industrial Commission of Ohio.

*Reidenbach Law Group*, *LLC*, *Emily N. Dodd*, and *J. Michael Reidenbach*, for respondent Central Ohio Behavioral Healthcare.

## IN MANDAMUS

{¶ 13} Relator Andre C. Tanyhill requests the issuance of a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its orders denying Tanyhill scheduled-loss compensation for partial loss of vision under R.C. 4123.57(B) and to issue a new order awarding Tanyhill such compensation. For the following reasons, the magistrate recommends that Tanyhill's request for a writ of mandamus be denied.

## I. Findings of Fact

{¶ 14} 1. On November 13, 2022, Tanyhill, who was employed as a corrections officer for respondent Central Ohio Behavioral Healthcare,[1] suffered an injury in the course of and arising out of his employment when a patient attacked him. Tanyhill was struck multiple times by the patient in the face and head.

{¶ 15} 2. Tanyhill's workers' compensation claim was ultimately allowed for the following conditions: conjunctival hemorrhage, left eye; concussion without loss of consciousness, head; contusion of unspecified part of head; head laceration; multiple retinal tears, left eye; retinal hole, left eye; and substantial aggravation of preexisting generalized anxiety disorder.

{¶ 16} 3. On November 14, 2022, the day after being injured at work, Tanyhill sought care at Hometown Urgent Care. Tanyhill was examined by Lauren Goettemoeller, N.P., who noted the following:

> Patient presents . . . for injury that occurred [on November 13, 2022]. Patient works as a corrections officer and was punched in the head approximately 3-4 times by his patient. Patient states he was able to work the rest of his shift without issue. Patient currently denies headache, dizziness, nausea, and vomiting. Patient does state he feels his vision is mildly blurry, however feels that has mostly resolved this morning. Patient does report some pressure behind his left eye. Patient also reports more floaters than normal, however does state he has some floaters at baseline. Patient follows regularly with ophthalmologist for excess pressure in his eye that he had treated in 2017.

(Stip. at 4.)

{¶ 17} 4. Later that same day, Tanyhill presented to Havener Eye Institute for a "Follow-Up Patient visit." (Stip. at 7.) Tanyhill "complain[ed] of redness, blurred vision, and pressure in the OS."[2] *Id.* Mark A. Slabaugh, M.D., also noted complaints of "some

---

[1] Respondent Central Ohio Behavioral Healthcare is also identified as Twin Valley Behavioral Healthcare.

[2] In the context of ophthalmological care, "OS" is an abbreviation of the Latin phrase "oculus sinister," meaning "left eye," whereas "OD," an abbreviation of the Latin phrase "oculus dexter," is used to indicate "right eye." *See Rua v. California Corr. Health Care Servs.*, 2020 U.S. Dist. LEXIS 77309, *4, fn. 4 (C.D.Cal. Mar. 27, 2020). Additionally, "OU" is an abbreviation of the Latin phrase "oculus uterque," which is used to mean "both eyes," but might be better understood as "each eye out of two" or "each eye of the pair." *See Barnhart v. Commr. of Social Sec.*, 2020 U.S. Dist. LEXIS 261742, *22, fn. 3 (N.D.Ohio Oct. 28, 2020); *Sanders v. Colvin*, 2015 U.S. Dist. LEXIS 20835, *19 (E.D.N.C. Feb. 2, 2015); *Taber's Cyclopedic Medical*

floaters and decreased vision OS." *Id.* at 8. Dr. Slabaugh provided the following assessment: "OAG high suspicion suspect: doing fine currently, IOP has been a little higher last couple of visits and discussed possibly repeating SLT if any higher." *Id.* Dr. Slabaugh emergently referred Tanyhill for treatment of a possible retinal tear in his left eye.

{¶ 18} 5. Based on the results of the retinal examination, Irina Livshitz, M.D., found Tanyhill had multiple retinal tears. Corrected visual acuity was found to be 20/20 in the right eye, and 20/40 in the left eye.[3] Dr. Livshitz diagnosed Tanyhill with the following conditions: (1) "retinal hole, left eye"; (2) "lattice degeneration, both eyes"; (3) "age related cataract, both eyes"; and (4) "POAG both eyes." (Stip. at 29.) Tanyhill was recommended to undergo "laser retinopexy to barricade around the tear" given the "risk of retinal detachment with possible vision loss if left untreated." *Id.* Tanyhill elected to proceed with the recommended care and underwent the surgical procedure.

{¶ 19} 6. Tanyhill returned to Hometown Urgent Care on November 21, 2022. Notes from Goettemoeller reflected that Tanyhill had retinal surgery and then a follow-up appointment with the retinal specialist the next day. Goettemoeller noted that Tanyhill continued to complain of "some blurry vision and floaters." (Stip. at 30.)

{¶ 20} 7. Tanyhill was once again seen at Hometown Urgent Care by Goettemoeller on November 28, 2022. Goettemoeller noted that Tanyhill "[a]dmit[ted] that his symptoms are improving." (Stip. at 33.) Tanyhill also "report[ed] overall improvement and improvement of his vision." *Id.* at 45.

{¶ 21} 8. Tanyhill was seen by Dr. Livshitz on January 17, 2023 for a follow-up appointment. Tanyhill's corrected visual acuity was found to be 20/20 in both eyes. Based on the examination, Dr. Livshitz provided the following assessment and plan: "stable, good laser surrounding tears, observe, may need additional laser, Call for changes in vision." (Stip. at 43.)

{¶ 22} 9. Tanyhill returned to Hometown Urgent Care for a follow-up appointment on February 6, 2023. Tanyhill was examined by Ethan Boardman, P.A., who noted: "Patient

---

*Dictionary* 1679 (23d Ed.2017) (defining, within the definition of "oculus," the term "o. uterque" to mean "[e]ach eye").

[3] "Visual acuity 'describes the ability of the eye to perceive details.' " *State ex rel. Bowman v. Indus. Comm.*, 2022-Ohio-233, ¶ 7, fn. 4, quoting American Medical Association, *Guides to the Evaluation of Permanent Impairment* 280 (5th Ed.2001). "Visual-acuity values are usually stated in terms of a Snellen fraction, e.g., 20/20 or 20/40." *Bowman* at ¶ 7, fn. 4.

overall feels he is nearly fully recovered, stating he no longer has pain in the eye and feels his vision is back to what it was before and only very occasionally has a floater in the left eye." (Stip. at 53.)

{¶ 23} 10. On May 22, 2023, Tanyhill was seen by Dr. Livshitz for a follow-up appointment. Tanyhill reported that "he got hit again at work on easter and noticed an increase in floaters but since it has stopped." (Stip. at 90.) With regard to the assessment and plan, Dr. Livshitz stated: "Stable imaging/exam, will continue to monitor." *Id.* at 94.

{¶ 24} 11. On June 4, 2023, Tanyhill filed an application for determination or increase of permanent partial disability ("C-92") form, in which he requested a determination of initial percentage of permanent partial disability.

{¶ 25} 12. On July 21, 2023, Maria Armstrong-Murphy, M.D., examined Tanyhill for purposes of evaluating permanent partial impairment. In a report issued the same day, Dr. Armstrong-Murphy summarized the history of Tanyhill's injury, his present complaints, and the results of the physical examination. Dr. Armstrong-Murphy stated that Tanyhill was "in need of recurrent laser treatment" and noted "severely decreased visual [acuity]." (Stip. at 64.) Based on the examination, Dr. Armstrong-Murphy found a whole person impairment in the amount of 10 percent. *Id.*

{¶ 26} 13. On September 14, 2023, Donato Borrillo, M.D., conducted a telemedicine interview and examination of Tanyhill for purposes of evaluating permanent partial impairment. In a report dated November 21, 2023, Dr. Borrillo summarized the history of Tanyhill's injury and the results of the physical examination. Dr. Borrillo assessed the following conditions collectively: multiple retinal tears, left eye; conjunctival hemorrhage, left eye; and retinal hole, left eye. With regard to these conditions, Dr. Borrillo found a Class 2, 10 percent whole person impairment based on "severely decreased visual acuity," while also noting "a need for recurrent laser treatment." (Stip. at 59.) Next, Dr. Borrillo assessed the following conditions collectively: head laceration, head; concussion without loss of consciousness, head; and contusion of unspecified part of head. For these conditions, Dr. Borrillo found a Class 1, 5 percent whole person impairment. Dr. Borrillo concluded that Tanyhill had a total combined whole person impairment in the amount of 16 percent.

{¶ 27} 14. In an addendum dated November 28, 2023, Dr. Borrillo opined that Tanyhill "did suffer for 'all practical purposes' a loss of vision due to the allowed ocular

injuries." (Stip. at 62.) Dr. Borrillo further stated: "No doubt the retinal tears and hole are permanent and continue to deteriorate over time." *Id*.

{¶ 28} 15. On December 5, 2023, Tanyhill filed a C-86 motion requesting compensation for partial loss of uncorrected vision pursuant to R.C. 4123.57(B).

{¶ 29} 16. At the request of the Bureau of Workers' Compensation ("the bureau"), Dr. Armstrong-Murphy completed a physician review (also known as a "MEDCO-21") on March 6, 2024 in response to Tanyhill's motion for compensation for partial loss of uncorrected vision. Included in the referral were the following instructions:

> Your report should include the injured worker's pre-injury uncorrected vision in addition to his or her post-injury uncorrected vision. If the pre-injury uncorrected vision is unknown, assume it to be 20/20 for the eye. However, if the injured worker had prescription eyeglasses or contacts prior to the date of injury and [the bureau] did not provide medical evidence to document the pre-injury vision please contact us prior to rendering a decision. [The bureau] will work with the injured worker to obtain the medical records and refer the case back to you for an opinion.

(Stip. at 66.) The bureau also provided several definitions for purposes of the physician review. With regard to "pre-injury uncorrected visual acuity," the bureau stated:

> "Pre-injury uncorrected visual acuity" means the injured worker's visual acuity before the injury, without correction by glasses or contacts. However, if a surgical correction has been performed pre-injury you should not discount the improvement gained from this surgery. You should use the injured worker's visual acuity after recovery from this surgical correction. You should still discount any improvement provided by the correction through the use of lenses or contacts.

*Id*. Next, with regard to "post-injury uncorrected visual acuity," the bureau stated:

> "Post-injury uncorrected visual acuity" means the claimant's visual acuity after the injury and without correction by glasses, contacts, or surgery. However, if a prosthetic surgical correction has been performed pre-injury we do not discount the improvement gained from a similar surgery performed post injury. For example, if the claimant's lens or cornea was replaced pre-injury and had to be replaced again after the injury the claimant has not lost a natural body part so the surgery is no longer considered a correction, but instead a restoration of vision. This allows an "apples to apples" comparison of the eye pre and post injury. You should use the

claimant's visual acuity after recovery from this post injury surgery as the "uncorrected visual acuity post-injury[."] You should still discount any improvement provided by correction through use of lenses or contacts.

Id. at 67. Finally, with regard to "loss of uncorrected vision," the bureau stated: " 'Loss of uncorrected vision' means the percentage of vision lost because of the injury that results solely from 'allowed conditions' prior to correction of these conditions by glasses, contacts, or surgery (except where surgery occurred pre-injury as previously addressed)." *Id.*

{¶ 30} Dr. Armstrong-Murphy summarized the records reviewed and relevant information from the records. Based on records related to the referral for possible retinal tear, Dr. Armstrong-Murphy addressed reported visual acuity as follows: "Visual acuity prior to the injury: Bilateral 20/20. Evaluated on the day of injury prior to the surgery on the left eye 20/40." (Stip. at 67.)

{¶ 31} Dr. Armstrong-Murphy responded to several questions posed by the bureau. First, the bureau asked: "What was the injured worker's pre-injury uncorrected visual acuity? This may be obtained from medical documentation or, in the absence of evidence to the contrary, please assume that vision was 100% (20/20) prior to the injury/disease." *Id.* at 68. Dr. Armstrong-Murphy responded:

> The uncorrected visual acuity is not noted in the chart. The claimant did wear glasses but did not have symptoms of floaters or persistent eye irritation prior to the industrial injury in question. He wore the glasses on the date of injury when his eyes were evaluated and acuity was checked wearing glasses 20/20 on the right eye, and 20/40 on the left eye prior to the surgery. This is the only information available in the chart.

*Id.* Second, in response to being asked to provide Tanyhill's post-injury uncorrected visual acuity, Dr. Armstrong-Murphy stated:

> The postinjury uncorrected visual acuity has not been tested at the ophthalmologist. He is still wearing his old glasses and has intermittent symptoms in regard to the retinal detachment and the surgery of the laser retinopexy of the left eye. Currently, with his visual correction, the claimant states he has had a change in his eyeglasses, this evaluation from the ophthalmologist is not available for my review.

> The claimant has not a repeat eye examination and acuity testing since he is still in the period of time to be followed up ophthalmology in regard to his retinal tear with possible repeat surgery that could be indicated with infrequent symptoms. He has not had to undergo any further surgery. It is recommended that he have a postinjury uncorrected visual acuity tested. He is wearing his glasses and stated that on the days with symptoms he has adequate vision. I would assume that since his symptoms are intermittent that he would only have loss of visual acuity on the left eye on days affected by the retinal tear and the subsequent surgery all included in the claim.

*Id.*

{¶ 32} Third, the bureau asked Dr. Armstrong-Murphy to "express the loss of uncorrected vision that results from the allowed conditions as a percentage." (Stip. at 68.) The bureau further instructed: "If you do not feel the loss of vision is solely the result of the allowed conditions, please provide both a percentage of visual acuity loss resulting from the allowed conditions and a percentage of visual acuity loss resulting from non-allowed conditions." *Id.* Dr. Armstrong-Murphy responded:

> The loss of vision that was checked just after the entering question on the left eye was 20/40. There has not been repeat. Visual [sic] acuity testing noted in the chart for my review. Once it is available I'm happy to write an addendum to this file review. I would estimate that the visual acuity checked prior to the retinal surgery was 50% worse on his left eye. That would be a 25% decrease in overall visual acuity from baseline at the worst point in testing prior to the retinal surgery. It is my understanding that his vision has improved greatly since the retinal surgery.

*Id.* Fourth, and finally, in response to being asked to assess whether the allowed conditions in the claim rendered Tanyhill's corrected visual acuity to be 20/200 or worse, Dr. Armstrong-Murphy responded that Tanyhill was "not legally blind given the allowed conditions in the claim." *Id.* at 69.

{¶ 33} 17. In an order issued March 11, 2024, the bureau found that based on the physician review of Dr. Armstrong-Murphy, Tanyhill had sustained vision loss of the left eye in the amount of 25 percent. As a result, the bureau awarded Tanyhill scheduled-loss compensation.

{¶ 34} 18. At the request of Central Ohio Behavioral Healthcare, Tanyhill was examined by Jennifer A. Mattson, O.D., on April 18, 2024. In a report dated April 29, 2024, Dr. Mattson summarized the records reviewed, the history of Tanyhill's conditions, and the results of the examination. According to Dr. Mattson, Tanyhill reported that "he has worn glasses since he was a teenager for the correction of his nearsightedness (myopia) and that he has always been nearsighted." (Stip. at 73.)

{¶ 35} Dr. Mattson reported that Tanyhill's uncorrected visual acuity was "20/100 OD/OS and 20/70 OU at distance 20/20 OD, 20/40 OS* and 20/20 OU at near (consistent with myopia)." *Id*. Tanyhill's best corrected visual acuity was found to be "20/20 OD 20/30 OS, a[n]d 20/20 OU at distance and 20/20 OU at near with a manifest refraction." *Id*. Dr. Mattson's examination also revealed that Tanyhill had a "newly developing macular hole, stage 1b, that had not been noted on any prior examination." *Id*. Dr. Mattson found this finding to be "consistent with his measured acuity at 20/30 and was asymptomatic." *Id*. Dr. Mattson explained:

> Macular holes are most often caused by aging changes due to vitreous degeneration and subsequent traction of the vitreous-macular interface. . . . It is important to note that *this finding was incidental and not at all related to Mr. Tanyhill's work injury by direct causation or by flowthrough.* This is an aging change that is found in some people. *This is likely why his uncorrected near acuity was at 20/40 on my examination.

(Emphasis in original.) *Id*.

{¶ 36} Next, Dr. Mattson responded to questions similar to those posed to Dr. Armstrong-Murphy. First, Dr. Mattson was asked: "What was the claimant's pre-injury uncorrected visual acuity based on the medical documentation on file, or in the absence of the contrary, please assume that vision was 100% (20/20) prior to the injury?" Dr. Mattson responded in part as follows:

> Mr. Tanyhill's amount of myopia would be consistent with uncorrected visual acuity ranging from 20/80 to 20/125, prior to his injury. Mr. Tanyhill's uncorrected visual acuity (tested by me) was 20/100 OD and 20/100 OS, 20/70 OU. This is consistent with the amount of myopia he has in each eye, therefore I would conclude that there is no uncorrected vision loss. It is clear based on the other letters of IMR and IME that Mr. Tanyhill's refractive error was not taken into account when visual impairment was determined. Because Mr. Tanyhill is nearsighted and has worn glasses since he was in

> his teens, per his history, it cannot be assumed that his pre-injury vision was at 100% uncorrected. The most accurate way to determine any vision loss would be by his . . . *best corrected visual acuity*, which in the left eye was 20/40 on 11/14/2022 (one day after injury), 20/20 on 1/7/2023, 20/25 on 05/22/2023, and 20/30 on the day of my examination. This is considered visual acuity in the normal range per the AMA Guides to the Evaluation of Permanent Impairment.

(Emphasis in original.) (Stip. at 74.) Second, when asked to provide Tanyhill's current uncorrected vision loss, Dr. Mattson found that Tanyhill had an "acuity impairment rating" of two percent. *Id.* In reaching this conclusion, Dr. Mattson stated that "uncorrected vision loss cannot be used due to significant pre-existing refractive error." *Id.*

{¶ 37} Third, Dr. Mattson was asked to provide the percentage of vision of the left eye that has been lost. Dr. Mattson was instructed that "[i]f you do not feel the loss of vision is solely the result of the allowed conditions, please provide both a percentage of visual acuity loss resulting from the allowed conditions and a visual acuity loss resulting from the non-allowed condition(s)." *Id.* Dr. Mattson responded that two percent of Tanyhill's functional acuity has been lost, though Dr. Mattson noted "this may or may not be due to injury." *Id.* Dr. Mattson further explained:

> It is important to note that on the day of my examination with Mr. Tanyhill, he was discovered to have a stage 1b macular hole in his left eye, which is commonly related to aging changes in the eye. This would not have been in any way related to the injuries he sustained during his work related accident directly or by flow through, as this occurred in the center of his retina (macula), where as his prior injuries were in the periphery of his retina and were still well treated and intact at the time of my examination. In my opinion his visual acuity of 20/30 on the day of my exam was fully due to this condition and not his work injury at all. This is supported by his normal vision findings on 01/07/2023 and 05/22/2023 which were well after the repair of his work related injury.

> If there is any vision loss at this point (20/30 vision is still considered near normal vision) it is due to the new finding of a macular hole, OS from my examination on 04/18/2024, which is a non-allowed condition.

*Id.* at 74-75. Fourth, and finally, when asked whether the allowed conditions caused Tanyhill to have 20/200 corrected visual acuity or worse, Dr. Mattson responded in the negative, stating that Tanyhill was "not legally blind." *Id.* at 75.

{¶ 38}  19. On May 9, 2024, a commission district hearing officer held a hearing on an appeal filed by Central Ohio Behavioral Healthcare from the bureau's March 11, 2024 order. In an order issued May 15, 2024, the district hearing officer affirmed the bureau's order and granted Tanyhill's December 5, 2023 C-86 motion. Based on the July 21, 2023 and March 6, 2024 reports of Dr. Armstrong-Murphy, the district hearing officer found Tanyhill sustained a 25 percent loss of uncorrected vision in the left eye as the direct and proximate result of the work-related injury in the claim.

{¶ 39}  20. On June 3, 2024, Tanyhill was examined by Dr. Livshitz. Tanyhill stated that he "got an updated glasses prescription in Fall 2023" and that "[t]he new glasses seem to be working well for him." (Stip. at 110.)

{¶ 40}  21. On June 28, 2024, a commission staff hearing officer held a hearing on an appeal filed by Central Ohio Behavioral Healthcare from the district hearing officer's May 15, 2024 order. In an order issued July 3, 2024, the staff hearing officer vacated the district hearing officer's order and denied Tanyhill's December 5, 2023 C-86 motion. As grounds for this decision, the staff hearing officer stated: "The Hearing Officer is not persuaded that [Tanyhill] has met his burden of proving that he sustained a loss of vision in his left eye due to his injury that is the subject of this claim." (Stip. at 80.) The staff hearing officer stated that the order was based on the April 29, 2024 report of Dr. Mattson, "who opines that there is no uncorrected vision loss." *Id.* The staff hearing officer rejected the opinion of Dr. Armstrong-Murphy, stating:

> In addition, the only medical provider who purports to provide a percentage of vision loss, Maria Armstrong-Murphy, M.D., in her [March 6, 2024] addendum report, states that [Tanyhill's] uncorrected visual acuity is not noted in the chart, the post injury uncorrected visual acuity has not been tested at the ophthalmologist, [Tanyhill] states he has had a change in his eyeglasses but this evaluation from the ophthalmologist is not available for her review, [Tanyhill] has not had a repeat eye examination and acuity testing, it is recommended that [Tanyhill] have a post injury uncorrected visual acuity test, and there has not been repeat visual acuity testing noted in the chart for her review and once it is available

> she is happy to write an addendum to her review, all of which
> gives the Hearing Officer the impression that Dr.
> [Armstrong-]Murphy does not have confidence in her opinion
> as she does not have sufficient medical evidence to review.

(Stip. at 80.)

{¶ 41} 22. On July 22, 2024, Tanyhill appealed the staff hearing officer's July 3, 2024 order.

{¶ 42} 23. In an order issued August 1, 2024, the commission, through its staff hearing officers, issued an order refusing Tanyhill's July 22, 2024 appeal.

{¶ 43} 24. Tanyhill filed his complaint for a writ of mandamus with this Court on February 13, 2025.

## II. Discussion and Conclusions of Law

{¶ 44} Tanyhill asserts entitlement to a writ of mandamus ordering the commission to vacate its orders denying his request for scheduled-loss compensation and to issue a new order granting such compensation.

## A. Requirements for Mandamus

{¶ 45} To be entitled to the issuance of a writ of mandamus, Tanyhill must establish (1) a clear legal right to the requested relief, (2) that the commission has a clear legal duty to provide such relief, and (3) the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). "A writ of mandamus may lie when there is a legal basis to compel the commission to perform its duties under the law or when the commission has abused its discretion in carrying out its duties." *State ex rel. Cassens Corp. v. Indus. Comm. of Ohio*, 2024-Ohio-526, ¶ 10.

{¶ 46} With regard to legal questions, a writ of mandamus " 'may issue against the Industrial Commission if the commission has incorrectly interpreted Ohio law.' " *Cassens* at ¶ 10, quoting *State ex rel. Gassmann v. Indus. Comm.*, 41 Ohio St.2d 64, 65 (1975). With regard to factual determinations, the commission abuses its discretion where there is no evidence upon which the commission could have based its factual determination. *See State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165, 167 (1981). *See State ex rel. Johnson v. Indus. Comm.*, 11 Ohio App.3d 22, 23 (10th Dist.1983) ("For more than fifty years, the 'some-evidence' rule, although not always referred to by that name, has been recognized as

the rule to be applied in determining whether there has been an abuse of discretion with respect to factual matters."). Furthermore, in all matters affecting the rights and obligations of the claimant or employer, the commission must specifically state what evidence has been relied upon and briefly explain the reasoning for its decision. *See State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991), at syllabus; *State ex rel. Yellow Freight Sys. v. Indus. Comm.*, 1994-Ohio-173, 71 Ohio St.3d 139, 142.

## B. Scheduled Loss-of-Sight Claims Under R.C. 4123.57(B)

{¶ 47} Scheduled-loss compensation, or "compensation that is paid to an injured worker for the loss of a body part as listed in the schedule," is governed by R.C. 4123.57(B). *State ex rel. Coleman v. Indus. Comm.*, 2013-Ohio-2406, ¶ 16. This statute "specifies, to some degree, how loss is measured, based on the anatomy of the affected [body part]." *State ex rel. Riter v. Indus. Comm.*, 2001-Ohio-290, ¶ 12. In pertinent part, R.C. 4123.57(B) provides:

> In cases included in the following schedule the compensation payable per week to the employee is the statewide average weekly wage . . . and shall be paid in installments according to the following schedule:
>
> . . .
>
> For the loss of the sight of an eye, one hundred twenty-five weeks.
>
> For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five percent loss of uncorrected vision. "Loss of uncorrected vision" means the percentage of vision actually lost as the result of the injury or occupational disease.

R.C. 4123.57(B). Thus, "R.C. 4123.57(B) contains two provisions authorizing scheduled loss-of-vision awards: one for the total 'loss of sight of an eye,' regardless of the percentage of vision lost, and another for the 'permanent partial loss of sight of an eye,' which depends on the percentage of vision lost." *State ex rel. Beyer v. Autoneum N. Am.*, 2019-Ohio-3714, ¶ 18. In light of the distinctions between these two provisions, "[t]he question under R.C. 4123.57(B) is whether a claimant has suffered loss of sight or partial loss of sight." *State ex rel. AutoZone, Inc. v. Indus. Comm.*, 2008-Ohio-541, ¶ 18.

{¶ 48} "[A]n award for total loss of sight may be supported by medical evidence of postinjury vision loss that renders a claimant 'legally blind' (i.e., having a corrected visual acuity of 20/200 or less)." *State ex rel. Cogan v. Indus. Comm.*, 2023-Ohio-3567, ¶ 15. "The statutory standard for measuring a partial loss of sight is 'the percentage of vision actually lost as a result of the injury.' " *Beyer* at ¶ 10, quoting R.C. 4123.57(B). " 'Vision' is not necessarily synonymous with 'visual acuity' "; rather, "vision has several components, including visual acuity, visual field, and ocular motility." *State ex rel. Bowman v. Indus. Comm.*, 2022-Ohio-233, ¶ 14. "If the injured worker has conditions affecting aspects of vision other than visual acuity, the 'percentage of vision actually lost' must account for those factors." *Id.*

{¶ 49} "Because the commission lacks medical expertise, claims involving medical determinations may be established only by submitting appropriate medical evidence." *Beyer* at ¶ 12. *See State ex rel. Stephenson v. Indus. Comm.*, 31 Ohio St.3d 167, 171 (1987) (stating that a claimant's impairment, meaning "the amount of a claimant's anatomical and/or mental loss of function," must be "determined by the doctors and set forth within the medical reports"). Furthermore, it is well-established that "the claimant bears the burden to affirmatively demonstrate with medical evidence the loss at issue under R.C. 4123.57(B)." *State ex rel. Walters v. Indus. Comm.*, 2024-Ohio-552, ¶ 21. *See State ex rel. Koepf v. Indus. Comm.*, 2019-Ohio-3789, ¶ 6 (10th Dist.). Thus, in order to establish a claim for a scheduled-loss award for partial loss of sight under R.C. 4123.57(B), a claimant is "required to submit medical evidence showing the degree of [the] visual impairment." *Beyer* at ¶ 13. *See Bowman* at ¶ 15 ("In claims seeking compensation for the permanent partial loss of vision under R.C. 4123.57(B), the degree of the injured worker's visual impairment, i.e., the percentage of uncorrected vision lost, must be determined by physicians—not the commission.").

## C. Whether Commission Erred in Denying Scheduled-Loss Compensation

{¶ 50} Tanyhill sought scheduled-loss compensation for partial loss of sight of his left eye and, thus, bore the burden of affirmatively demonstrating with medical evidence the "percentage of vision actually lost as a result of the injury." R.C. 4123.57(B). The commission, through its staff hearing officer, found Tanyhill failed to meet this burden. Now, Tanyhill asserts the commission abused its discretion in making this determination

based on his arguments that (1) Dr. Mattson's report was not some evidence on which the commission could rely, and (2) the report and addendum of Dr. Borrillo and the physician review of Dr. Armstrong-Murphy prove Tanyhill is entitled to the scheduled-loss compensation for partial loss of sight. Since the burden is Tanyhill's to bear, it is appropriate to begin by addressing the evidence that, according to Tanyhill, proves he is entitled to a scheduled loss-of-sight award.

{¶ 51} First, Tanyhill argues that Dr. Borrillo's November 21, 2023 report and November 28, 2023 addendum, which were produced in support of Tanyhill's application for permanent partial disability, are evidence supporting a scheduled loss-of-sight award. Assessing the allowed conditions related to Tanyhill's left eye, Dr. Borrillo opined in the report that Tanyhill had "severely decreased visual acuity" and found there was "a need for recurrent laser treatment." (Stip. at 59.) In the addendum, Dr. Borrillo opined that Tanyhill "did suffer for 'all practical purposes' a loss of vision due to the allowed ocular injuries as contemplated under [R.C.] 4123.57(B)." (Stip. at 62.) Yet, nowhere in either the report or addendum did Dr. Borrillo opine as to the specific amount of vision Tanyhill lost.

{¶ 52} "[T]o establish [a] claim for an R.C. 4123.57(B) award, which is based on the 'percentage of vision actually lost,' " a claimant is "required to submit medical evidence showing the degree of [the] visual impairment." *Beyer*, 2019-Ohio-3714, at ¶ 13. While Dr. Borrillo's opinion could constitute evidence of **an** impairment, it was not "evidence reflecting a physician's determination of [the claimant's] **degree** of impairment." (Emphasis added.) *Id.* at ¶ 14. Dr. Borrillo also did not state that Tanyhill suffered a total loss of sight. *Compare AutoZone* at ¶ 25 (holding that the opinions of two doctors that the claimant "was rendered legally blind in his left eye due to a workplace injury constituted 'some evidence' in the record to support the commission's decision that [the claimant] had suffered 'the loss of the sight of an eye' under R.C. 4123.57(B)"). Nor would it have been appropriate for the commission to determine Tanyhill's degree of impairment on its own. *See Beyer* at ¶ 1 (stating that "a physician, not the commission, must determine the degree of a claimant's impairment"). As Dr. Borrillo neither determined Tanyhill's degree of impairment, nor opined that Tanyhill had suffered a total loss of sight, Dr. Borrillo's report and addendum do not constitute some evidence on which the commission could rely in making a scheduled-loss award for loss of sight.

{¶ 53} Second, Tanyhill argues the staff hearing officer erred by rejecting the report of Dr. Armstrong-Murphy. Tanyhill asserts that the commission "rejected Dr. Maria Armstrong-Murphy's opinion by labeling it speculative due to the absence of formal acuity measurements." (Tanyhill's Reply Brief at 3.) This statement does not exactly reflect the staff hearing officer's basis for rejecting Dr. Armstrong-Murphy's opinion as set forth in the March 6, 2024 physician review. Noting that Dr. Armstrong-Murphy was "the only medical provider who purports to provide a percentage of vision loss," the staff hearing officer summarized the following statements made by Dr. Armstrong-Murphy:

> [Tanyhill's] uncorrected visual acuity is not noted in the chart, the post injury uncorrected visual acuity has not been tested at the ophthalmologist, [Tanyhill] states he has had a change in his eyeglasses but this evaluation from the ophthalmologist is not available for her review, [Tanyhill] has not had a repeat eye examination and acuity testing, it is recommended that [Tanyhill] have a post injury uncorrected visual acuity test, and there has not been repeat visual acuity testing noted in the chart for her review and once it is available she is happy to write an addendum to her review.

(Stip. at 80.) The staff hearing officer concluded that all of these statements gave "the impression that Dr. [Armstrong-]Murphy does not have confidence in her opinion as she does not have sufficient medical evidence to review." *Id.*

{¶ 54} It is well-established that "[t]he commission is the exclusive finder of fact and has the sole responsibility to evaluate the weight and credibility of the evidence." *State ex rel. Kidd v. Indus. Comm.*, 2023-Ohio-2975, ¶ 17. Yet, in its role as finder of fact, "[t]he commission may not arbitrarily reject competent medical proof." *State ex rel. Ritzie v. Reece-Campbell, Inc.*, 2015-Ohio-5224, ¶ 13. "The commission must articulate some reasonable basis to reject a physician's finding based on evidence in the record." *Id. See State ex rel. Cleveland Metro. School Dist. v. Indus. Comm.*, 2022-Ohio-2150, ¶ 6 (10th Dist.) (stating that "the commission has the discretion to reject uncontroverted medical evidence so long as the commission explains its reason for doing so").

{¶ 55} Here, the staff hearing officer rejected Dr. Armstrong-Murphy's report and provided a brief explanation setting forth a reasonable basis for the rejection. As noted by the staff hearing officer, Dr. Armstrong-Murphy indicated there was information that was not available for review in reaching the conclusions in the report. Having been asked to provide Tanyhill's preinjury uncorrected visual acuity, Dr. Armstrong-Murphy noted that

Tanyhill wore glasses prior to the injury, but no uncorrected visual acuity measurement was present in his chart. Dr. Armstrong-Murphy stated that Tanyhill wore glasses on the date of his injury and his visual acuity was measured on that day while he was wearing glasses. This corrected visual acuity measurement of "20/20 on the right eye, and 20/40 on the left eye prior to the surgery" was "the only information available in the chart." (Stip. at 68.) Dr. Armstrong-Murphy stated that "[i]t is recommended that [Tanyhill] have a postinjury uncorrected visual acuity tested." *Id.* When asked to provide a percentage of loss of uncorrected vision based on the allowed conditions, Dr. Armstrong-Murphy listed Tanyhill's corrected vision prior to surgery and provided an estimate as follows:

> The loss of vision that was checked just after the entering question on the left eye was 20/40.[4] There has not been repeat. Visual acuity testing noted in the chart for my review. Once it is available I'm happy to write an addendum to this file review. I would estimate that the visual acuity checked prior to the retinal surgery was 50% worse on his left eye. That would be a 25% decrease in overall visual acuity from baseline at the worst point in testing prior to the retinal surgery. It is my understanding that his vision has improved greatly since the retinal surgery.

(Sic passim.) *Id.* In this way, Dr. Armstrong-Murphy noted the absence of some information, provided an estimate, and indicated willingness to provide another opinion if supplied with more evidence.

{¶ 56} Tanyhill does not dispute the accuracy of the staff hearing officer's summary of statements in Dr. Armstrong-Murphy's report. Indeed, as set forth above, the record contains some evidence supporting the staff hearing officer's reasoning in rejecting that report. This is all that is required for the commission, as finder of fact, to reject medical evidence—even uncontradicted medical evidence. *See Ritzie* at ¶ 13; *Cleveland Metro* at ¶ 6. As a result, it was not an abuse of discretion for the staff hearing officer to reject Dr. Armstrong-Murphy's report. Though Tanyhill urges this Court to accept Dr. Armstrong-Murphy's report as establishing entitlement to a scheduled loss-of-sight award, doing so would supplant the commission as finder of fact in evaluating the weight and credibility of the evidence. This is beyond the scope of review available in mandamus.

---

[4] Though it is unclear from the report itself, Dr. Armstrong-Murphy's statement regarding "[t]he loss of vision that was checked just after the *entering* question" might have been intended to be written as "[t]he loss of vision that was checked just after the *injury in* question."

*See State ex rel. Digiacinto v. Indus. Comm.*, 2020-Ohio-707, ¶ 13 ("The commission is the exclusive finder of fact in workers' compensation matters; a court's role in adjudicating a mandamus complaint is to determine whether the commission abused its discretion by entering an order that is not based on some evidence in the record.").

{¶ 57}  Next, Tanyhill argues that Dr. Mattson's report is not some evidence on which the commission could rely in denying Tanyhill's request for a scheduled loss-of-sight award. Dr. Mattson opined that Tanyhill had no loss of vision solely as a result of the allowed conditions. Thus, leaving aside the question of whether Dr. Mattson's report is some evidence to support *denying* the award, it is undisputed that Dr. Mattson's report does not serve as some evidence to *support* a scheduled loss-of-sight award. Furthermore, the staff hearing officer did not provide Dr. Mattson's report as a reason for rejecting Dr. Anderson-Murphy's report. As the rejection of Dr. Anderson-Murphy's report was on independent grounds, any error with regard to reliance on Dr. Mattson's report does not implicate the commission's rejection of Dr. Anderson-Murphy's report. *See State ex rel. Wombold v. Indus. Comm.*, 2009-Ohio-5578, ¶ 5 (10th Dist.) (finding "any possible error associated with the commission's reference to [a physician's report] report was harmless and of no consequence" where the commission made a finding that constituted "an independent basis" to support the commission's determination). Since the commission rejected Dr. Armstrong-Murphy's report and Dr. Borrillo's report does not constitute some evidence to support a scheduled loss-of-sight award under R.C. 4123.57(B), there is no medical evidence in the record upon which the commission could rely to grant such an award.

{¶ 58}  As previously stated, it is the claimant's burden to affirmatively demonstrate with medical evidence the loss at issue under R.C. 4123.57(B). *See Walters*, 2024-Ohio-552, at ¶ 21. Where there is no evidence to support the loss at issue, the claimant has not met their burden and the request for scheduled-loss compensation under R.C. 4123.57(B) must be denied. *See id.* at ¶ 22; *State ex rel. Smith v. Indus. Comm.*, 2014-Ohio-513, ¶ 18. Thus, even if the commission erred in relying on Dr. Mattson's report, the staff hearing officer's conclusion that Tanyhill had not "met his burden of proving that he sustained a loss of vision in his left eye due to his injury that is the subject of this claim" would remain to support denial of an award. *See State ex rel. Sagraves v. Indus. Comm.*, 2012-Ohio-1010, ¶ 9 (10th Dist.) (stating that "even if we were to remove the commission's conclusion

concerning a discernible survival period, the commission's conclusion concerning a lack of evidence to support a permanent loss would remain to support its denial of an award"). As there remained no medical evidence to support Tanyhill's request for a scheduled loss-of-sight award following the rejection of Dr. Anderson-Murphy's report, the magistrate cannot find that the commission abused its discretion in denying Tanyhill's request.

## D. Conclusion

{¶ 59} Tanyhill has not demonstrated a clear legal right to the requested relief or that the commission had a clear legal duty to provide such relief. Accordingly, it is the decision and recommendation of the magistrate that Tanyhill's request for a writ of mandamus should be denied.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.